Mr. Justice Cox
delivered the opinion of tbe Court:
Voluminous testimony was taken in this case. Tbe length of the bill which contains fifty-six paragraphs, taken together with the mass of evidence, would make a discus *25 •sion of. the case in detail extremely tedious, and I think it will be unnecessary. I shall, therefore, state the conclusions •arrived at by the court in a somewhat general way.
It appears that in the year 1883, the complainant was the owner of certain patents relating to telegraphy, telephony and electric lighting, and some other applications of electricity to the useful arts, and that he had pending some •applications for other patents. He was desirous, as he says, •of having associated with him persons of position and influence who would promote the success of his enterprise •and the introduction of his inventions into general use. He therefore cast about to find persons answering this ■description and he became acquainted with one and then •another of the defendants in this case, and such acquaintanceship culminated in an agreement which was signed on March 13, 1883, by the complainant, General Joseph E. ■Johnston, A. H. Garland, John D. O. Atkins, Isham G. Harris and Casey Young, and which is set out in Exhibit B, filed with the bill. The substance of that agreement was, that the parties should constitute themselves an association or joint stock pompany, for the purpose of developing the various inventions in which the complainant was interested, and it further sets forth that it was mutually agreed that the value of the several improvements, as betwen the parties, should be estimated at $1,000,000, and that that amount should be divided into ten equal parts or shares ; four of which were to be held by the complainant, •J. H. Rogers, and one by each of the other parties, and the remaining part should be held jointly by the company “to be disposed of in such manner-as the members thereof may see fit.”
It was further agreed, that the parties will “as soon as the same can be done, procure a charter of incorporation, constituting themselves a corporate body, under the name and style of ‘ Pan-Electric 'Company/ embracing under such charter of incorporation such objects and powers as *26 they may deem proper,” &c. I will examine that more critically hereafter. It rvas further agreed that after they should be incorporated, all the capital stock should be the joint pi’operty of the company, and it might issue, sell or otherwise dispose of the same as might be seen fit, and it was further agreed that no member of the association should dispose of any stock at less than its face value, without consent of the executive committee; and there was a further provision that the complainant, J. Harris Rogers? should have the right to dispose of an interpst in the property of the company, 'estimating the whole at $5,000,000, to the amount of $170,000, on his own account. Then, it was further agreed that other parties might be admitted to the association, and it was understood that they were the joint owners of all the properties, rights or franchises therein set out or referred to, and that until the charter of incorporation should be procured, the company organized and the board of directors elected thereunder, there would be an executive committee of three, who were to conduct the business and affairs of the company, and were to have the privilege of assessing the members of the company, pro rata, to the amount of $150 each, and no greater sum should be assessed without authority from a majority of the members.
The parties stipulated to pay, in the manner and to the amounted specified, the expenses necessarily incurred in perfecting the inventions, discoveries, and improvements. Rogers agreed that any improvements of his inventions that he might make thereafter should be the joint property of the company, and the executive committee were to have the power to sell to other parties such interest in the properties of the company as they might see proper. The place of the business of the company was fixed at Washington. It was further agreed that the articles of agreement might be altered, or amended at anytime at the option of turn-thirds of the parties in interest.
*27 On May 19, 1884, another paper was executed by complainant alone, which recites that, “whereas, by mistake,, some patents were described in said contract which were not granted to said Rogers, and to which he had no right,, for which reason said contract is not recorded in the Patent Office ; ” and it is further recited that, since the date of the former contract, other patents have been granted to him and that other applications for patents have since .been made; and reciting further that the original contract provided that the interest in said inventions, &c., should be divided into ten equal parts or shares and that Rogers should retain four shares and that the said defendants should have-one share each, and the remaining share should be disposed of for the benefit of the association, or held by its members,in the ratio of their respective interests, the new contract then-goes on and assigns to the same parties, the defendants, an undivided interest of one-tenth, to each, in all the inventions and patents, and in all the inventions and discoveries upon which applications for patents have been filed in the Patent Office, which are described in said contract, and then continues, “And also to each, the said Johnston, Garland, Atkins, Harris, and Young an undivided interest in the undisposed of one-tenth of 'the whole in the ratio of their respective interests.” Then it enumerates the additional patents. After this additional contract was executed, the parties proceeded to experiment and test the several inventions which they thought worthy of it, and while that was going on, they examined the corporation laws of different States to ascertain what form of charter could be procured. It was discovered that the different corporation laws of the States imposed restrictions upon the privilege of being-incorporated under them and only allowed charters of incorporation. for one kind of business under one charter; in other words, the parties were unable to obtain a charter for the purpose of prosecuting the business of telegraphy, telephony, electric lighting, together, and the charter of incor *28 poration would have to be limited to one species of business.' After some considerable discussion, Mr. Casey Young undertook to have the incorporation law of Tennessee amended in this respect, but failed in his efforts. Thereupon they concluded to take out two distinct charters. Accordingly ,'they took out a charter under the laws of Tennessee under the title of the Pan-Electric Telephone Company, and under the laivs of New York they incorporated themselves ■as the Pan-Electric Telegraph Company, and on November 23, 1883, at a meeting of these parties, the charter procured under the laws of Tennessee was approved and accepted, and thereupon they organized each comparn*- by electing ■General Johnston, President; Vice-President, Isham G. Harris; Secretary and Treasurer, Casey Young; Attorney J. H. Garland, and Electrician, J. Harris Rogers. All the parties then united in assigning all the telephone patents to the first company and all the patents relating to telegraphy “to the second.
I suspend for a moment the history of this dealing between these parties at this point, to say that, on the 19th day of June, 1886, the complainant filed his bill in the present suit, in which he sets forth two special grievances. The first is, that under the contract between him and the defendants, it became their obligation to procure what he calls a comprehensive charter; that is, a charter embracing every class of business which they desired to prosecute, under which the whole of his patents could be made available, and that they failed to do this. In the next place, that they were under obligation, when this incorporation should take place, to issue stock and put it on the market to enable him to sell the stock and realize upon it, and he charges that, if that had been done, he would have been enabled to realize a very large fortune, and that he was defeated in that object by the refusal of these parties to issue the stock, and he claims that by reason of this allleged breach of the contract, they have forfeited all title to the *29 stocks that they received under these two. corporations and the money dividends received by them, and that they should respond to him in damages in the sum of $100,000..
The first question, therefore, is what is the obligation of the parties in reference to the charter they obtained. We-will first have to consult the agreement which was signed and sealed by the parties, the second clause of which reads, as follows :
“ It is further mutually agreed by the parties to this agreement that they -will, as soon as the same can be done, procure a charter of incorporation, constituting themselves a corporate body under the name and style of the ‘ Pan-Electric Company/ embracing under such charter of incorporation such objects ami powers as they may deem proper and as are allowed to incorporated bodies under the laws of the State of New York or of any other State in which said charter of incorporation may be obtainedThe letter of this agreement leaves it to the discretion of the parties thereto what kind of a charter shall be obtained and what the objects and purposes embraced in such charter of incorporation shali be. There was a verbal departure from the stipulation in one respect, as it evidently contemplated one charter of incorporation by these parties for the purpose of conducting all their business together, but that departure was made with the concurrence of the complainant himself. They found their original design impracticable, and they secured two charters, incorporated two companies, each having a capital of $5,000,000. That departure, I say, was with the concurrence of all the parties, including the complainant himself, so that there can be no grounds for complaint there; that the letter of this contract was violated in respect to what he calls the comprehensive charter. But his contention is that that instrument does not embody the whole contract; that there was another document which should be incorporated with it. Before the agreement was signed,, as he says,he caused to be prepared and printed a very highly *30 colored prospectus, a copy of which is shown in Exhibit A, filed with this bill, headed, “Pan-Electric Company.” “This company,” he goes on to say in this paper, “has been temporarily organized with the view of introducing into general use the several inventions described belonging exclusively to the Pan-Electric Company, but more especially to •develop others as yet but partially advanced, as set forth herein, and to control by capital and foresight ‘the future possibilities of electricity. ’ ”
He then proceeds to set out the various inventions and the probable value of some of"them:
Pie then proceeds to say, “We therefore propose to public consideration a powerful corporation to possess, a little in the future, vast laboratories, learned electricians, and skilled mechanics, standing ready to seize upon and develop whatever may be presented in the light of its influence, capital, and genius. Nor would it seem extravagant to say that such a corporation, with its now methods, might convert great coal fields into torrents of electricity; that it might, in time, harness the' very waves, clouds, waterfalls, and winds, to generate this mysterious agent of nature, and that busy marts and thoroughfares, with their bankers, tradesmen, and pompous fashions may soon be seen thousands of miles distant through the telemorphe, riding in carriages without horses, cars without steam, all lighted up by electric suns, in a new and enchanting civilization.
“ J. Plarris Rogers, late electrician United States Capitol, will be chief electrician of the ‘Pan-Electric Company.’ His ‘Secret Telephone’ stocked in New York at $5,000,000 and his ‘Electro-Has Telephone’ stocked at $1,000,000 have already enriched, himself and others, which past successes promise more to the ‘Pan-Electric Company,’ embracing so vast a field of invention and discovery. Several other prominent electricians, distinguished capitalists, and far-seeing, solid business men have already acquired various interests in the enterprise, and there being, as the company believe, *31 fortuues for hundreds of men, the object of this circular is to invite others to examine in practical operation several of the above described inventions,” etc.
“One-tenth interest will be sold only to moiled men applying for it, at a merely nominal price to construct machinery, and other interests will be.sold at auction on the New York Stock Exchange for what it may bring; but it is confidently predicted that the stock will ultimately go greatly above par. It may require years to effect this result for we depend in no way upon stock jobbing operations but upon a manly and scientific development of real values which stand on their intrinsic merits.
“Parties investigating must examine through their own electricians,” etc.
Now, he states that this paper, prepared by him at the first meeting of these parties in New York, was exhibited to them and read by them, and that he gave it to the defendants, Atkins, Harris, and Young, at the complainant’s house, with the view of their joining him in promoting his plans according to the general tenor of said Exhibit A, and that all the parties agreed to cany out the general plans as sot forth in said exhibit, and he is informed that one or more of the parties, Harris, Young, and Atkins, explained the agreement to Johnston and Garland, and gave to each one the pamphlet, and all agreed with complainant, during the month of February, 1883, to assist him in carrying out the general object and purpose of Exhibit A, and that the 'parties joined the association for that 'purpose.
This paper in Exhibit A sets forth the design of the parties and the manner of proceeding, and evidently looks to the sale of stock, immediately, upon the public market in New York. The defendants all deny that they gave any recognition to this paper. Some say that they never saw it, and others, if they did see it, looked upon it as a mere rhapsody and gave it no attention, and they repudiate it as an expression of their intentions. Thej’- say that the *32 agreement over their hands and seals contains the only-expression of their intention which is extant. The paper-shown in Exhibit A was not signed by any of the-defendants, nor was there any reference to it in the agreement which they signed. The complainant virtually endeavors,, by parol evidence, to incorporate, it with the signed agreement. He is well aware of the rule of law' that a written agreement contains the final expression of the intention of the parties, but that it may be read in the light of the surrounding circumstances, and a somewhat ingenious application of that rule to this case is sought to be made by the complainant, by saying that the written agreement is-to be read in the light of' the previous verbal understanding. This brings the case exactly within the rule on the subject as laid down by Greenleaf. Ho says that “ When parties have deliberately put their engagements in writing in such terms as import a legal obligation without any uncertainty as to the object or extent of such engagements, it is conclusively presumed that the whole engagement with the parties and the extent and manner of their undertaking was reduced to writing; and all oral testimony of a previous colloquium between the parties, or of conversation, or declarations, at the time when it was completed, or afterwards, as it would tend in many instances to substitute a new and different contract for the one which was really agreed upon,, to the prejudice possibly of one of the parties, is rejected. In other words, as the rule is now more briefly expressed, the prior contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument. It is to be observed that the rule is directed only against the admission of any other evidence of the language employed by the parties in making the contract than that which is-furnished by the writing itself. The writing, it is true, may be read by the light of surrounding circumstances in order more perfectly to understand the intent and meaning of the parties; but as they have constituted the writing to- be the- *33 only outward and visible consideration of their meaning, no other words are to be added to it, or substituted in its stead.”
It is claimed, however, by the complainant, that the paper in Exhibit A was afterwards recognized by the defendants. He says, in the first place, that the defendants adopted it because the treasurer paid the expenses of printing it. With the bill in the case there is an Exhibit G showing an account furnished by the complainant to the treasurer, Casey Young, amounting to $919.36, containing thirty items, and one of these items is “1,000 pamphlets, $25.” The account does not indicate at all what these pamphlets were, and Mr. Young testifies that he'was in the habit of paying the accounts furnished without scrutinizing the items, and it is quite possible that he paid this; 'he denies that.he had any idea that he was paying for pamphlets like Exhibit A, and there is no reason to doubt his word on that point; and even an implied admission of that sort, by him, -would not bind the other parties. It would amount to nothing.
The complainant relies also upon a letter of General Johnston’s, w'ho was the president, dated April 7,1883. It appears that complainant published the paper shown in Exhibit A in two forms; one without the names of the officers, and fixing the office of the company at Washington, and another containing at the top the names of the officers and fixing the office both in New York and Washington. This last, he says, was sent to General Johnston and he received a letter of April 7,1883, in reply, in which General Johnston says, “ I have received your letter via Danville, also the printed pamphlet intended, as you say, for a substitute for that printed by our association itself.” He then says, “ No one member of that committee can act for the whole,” and then he goes on to say, “the pamphlet, for which you propose a substitute, was the contract upon which our association was founded.. No one person, therefore, can put it aside. The association established its office in *34 Washington. In your pamphlet two offices are proposed as permanent, without authority, it seems to me.”
The complainant says that when General Johnston refers to the pamphlet, “ upon which our association was founded,” he means the first form of this paper, prepared by the complainant, in which, as he says, the office was located in Washington, and not both in New York and Washington. We have examined those two and we find that the first of these pamphlets does not locate the office anywhere, and the only thing that does fix the office is the sealed agreement which fixes the office at Washington. Again the complainant says that when General Johnston refers to tha pamphlet as “ the contract upon which our association was founded,” it must have been this pamphlet published and printed by him, because the contract between the parties was not printed and therefore was not a pamphlet. About that, however, he seems to be mistaken, because in his testimony before the Congressional Committee he testified that the agreement between the parties, of March 13, 1883, was in print, and a copy of it was forwarded to General Johnston.
Therefore, it appears that General Johnston was strictly accurate when he said, in his testimony, that what he referred to was the agreement recognized by the parties and signed by them. What would seem pretty conclusive, also, upon this’question is the second agreement signed by the complainant on Maj^ 19, 1884. This recites the original agreement as the contract between the parties and nothing else. It says, “ Whereas on the 13th day of March, 1883,” these parties entered into a contract by which they formed themselves into an association, &c. Therefore nothing in any act of these defendants, either at the time of the acceptance' of this original agreement, or since, commits them to a recognition of this extravagant manifesto -which was put forth by the complainant. We can hardly realize that any of these gentlemen would have been willing to sign the paper or give it their sanction.
*35 Some objection is made that the defendants might have procured what is called this comprehensive charter by going to the State of Virginia, where it is said that the law is more liberal than anywhere else. The testimony shows very conclusively that they made very diligent study of the statutes of the States, but it does not appear that the laws of Virginia were called to their attention. If it was an oversight it was as much one on the part of the complainant. as of the defendants, because the agreement was the mutual agreement of all the parties, and whatever omission •occurred was the common omission of all of them, and cannot be the subject of complaint by any one against the others. We have looked, however, at the statute of Virginia, and we think it extremely doubtful if any such charter could have been procured as is claimed. After enumerating certain classes of charters, the law provides that an application for a charter could be made for any kind of business, but it does not say that one charter could be obtained for a thousand and one kinds of business or any kind of business, but it is within the discretion of the court,‘after hearing the application, to grant the charter, and it is certainly not clear that such a charter as complainant describes could have been procured under.the law in question. We repeat, however, that if there were any laches in that respect it certainly was as much that of the complainant as of the defendants, and it is plain, therefore, we think, that there was no breach of this contract by the defendants, because of the failure to obtain the comprehensive charter.
But complainant further alleges that the parties in procuring these two limited charters — each charter providing for 'a capital of $5,000,000, and under each charter the complainant being entitled to stock to the amount of $2,170,000 — intended them simply as temporary expedients, or for certain very limited periods, and that the parties were- still to go to work to procure, this comprehensive charter, so called, embracing all of his inventions. Now, *36 all the defendants deny this, both in the pleadings and in the testimony, and say that there was no such object in view. Even Looney, an agent of complainant, to whom an interest in the enterprise was conveyed, testified that he never heard of these corporations being considered or intended as a temporary expedient. The complainant’s theory seems to be that the association and the corporations were identical, and that notwithstanding the transfer of all the patents to the corporations, the association had the right to sell stock and control all the business of the companies, and even take back the patents assigned to' them. The identity between the association and these corporations did exist in the first instance, but was very soon destroyed. The corporation had hardly been organized before the complainant insisted upon stock being issued to him by the treasurer of the organizations. The company was not willing to issue stock to go on the market, but they were willing to, and did, issue certificates in this form:
“ Office of the Pan-Electric Telephone Company. This is to certify that-is entitled to-shares of the capital stock of the Pan-Electric Telephone Company, tohenevcr ■it is the policy of the Board of Directors to issue the same, and to be charged to the account of J. Harris Rogers on the books of the company.”
Later on they issued another certificate wherein they stated that—
“This certificate entitles-to-shares of the capital stock of the Pan-Electric Telephone Company, of the par value of $100 each, so soon as the validity of the patents is judicially determined in any litigation instituted for that purpose. But this certificate is not transferable except with the consent of the president and secretary of the company indorsed hereon.”
Now, the complainant immediately after the organization, as I have said, insisted upon having these certificates of stock issued to him and on the very day after the organi *37 :zation of the corporations was completed, that is, November 24, 1883, 100 shares of the capital stock were issued, oil his order, to one person, and a hundred shares to another; on the 25th, 8,333-¡- shares were issued on his order to Looney and 5,000 shares to the order of J. W. Rogers. On the 19th of May, 1884, when the second agreement was made, three-fourths of the stock that he owned in both companies had been issued in this form, and still later a larger •amount was issued, so that by September, 1884, he had ■drawn the whole of his stock in the Telephone Company with the exception of a few thousand shares. I think it is •stated that the treasurer thought that the whole of it had been drawn, but he discovered afterwards that he was mistaken, and that there were some $4,000 or $5,000 of it ■remaining. As soon as other stockholders came into this ■company, the relation theretofore subsisting between'the ■association and the corporations was at an end. New stockholders acquired indefeasible rights to the stock and to the patents and other property upon which the same was based, •■and the association could not reclaim the property. As late as July, 1887, when a dividend was made, it appeared, I think, that some twenty-seven stockholders, in addition to the original parties, had become members of the Pan-Electric Telephone Company. • So that this association could not have withdrawn those patents after they passed from their ownership into that of a new legal person. The amount of stock, of course, in these two companies was limited, and they could not issue any more stock than was ¡authorized by the charters, and if it had been issued it would have been the illegal process of watering the stock. If a new company had been organized as complainant suggests, it could not have controlled the stock in the existing companies that had already been assigned to other parties, and it could not have issued stock except upon patents remaining in the possession of the association. The complainant’s idea is, apparently, that there was to be a new *38 comprehensive charter, and that new stock was to be issued, to be exchanged for the stock of the limited corporations.. But, as I have just stated, if a new company should be incorporated and new stock issued, it would only be based on those patents that were in 'the ownership of the original parties, and which could be assigned to the new organization. The stock issued under such new companies could not be exchanged for the stock based upon entirely different patents without the consent of the parties, nor could the stockholders be compelled to receive such stock. Therefore, the idea of creating a new company,the stock in which was to be substituted for that of the old company, was simply a legal absurdity. It had been rendered absolutel}' impossible, and the complainant was a party to the proceedings whereby that was rendered impossible. Pie has, plainly, no right to complain of the creation of these two companies under the laws of Tennessee and New York, respectively, to which he was a party, and of the legal consequences of such proceedings.-
Now, the next ground of complaint is that the defendants refused to allow stock to be issued by which he could realize money. He says that the original association — the Pan-Electric Company — was to issue stock, and that he sent on the book of certificates of the stock to General Johnston, which was paid for, and therefore his action in the premises was legalized and ratified, and he says he was authorized to do it by all of the parties, and produces one of the certificates of stock. But upon examination, we see that it is evidently intended for an incorporated company; it reads : “Organized under the laws of the State of New York, fully paid and not assessable,” and it is prepared to be signed-by a president and secretary, which shows that it was in anticipation of the formation of the corporation.
We are again to refer to the contract to see what the parties were bound to do with reference to the issue of stock,, and that simply says that “ the capital stock of the said *39 corporation — the corporation contemplated by the original agreement — shall be the joint property of this company, and it may issue, sell, or otherwise dispose of so much thereof as they may see fit” The reason why these gentlemen would not consent to the issue of the stock was, .that the value of these patents was not established, and if they issued the stock and put it on the market with their names to it, it would be a proclamation to the financial world that this stock was founded on something of value and an invitation to capitalists to invest money in it, and that if that had been done it would have been an imposition upon the public, when the value of 'the patents was wholly conjectural; and they reached the conclusion that they ought not to do so. If they had consented to the use of their names, and these patents had been shown not to be worth a cent, everybody would have said that it was a fraud, and these defendants had a right to anticipate all these contingencies. They only exercised proper precaution, and showed due regard to their reputation and fair dealing with the public in withholding their consent to the issue of this stock until these patents could be tested and their value ascertained. They did make some experiments to test the value of the electric light apparatus and they found that it was useless ; that is to say, that the expense attending it was such that it would not pay, in competition with other, patents, and the complainant himself suggested that it was useless to proceed further.
The complainant, in his bill, says that he tried to secure additional associates who could influence some legislative'body to grant the comprehensive charter, &c., and who could by their illustrious names guarantee sales of the stock. He further says that he was not dependent upon the defendants for money, for he had more ready cash than all of them together; he was dependent on them for their names and influence to secure the comprehensive charter and to give value to the stock when issued. I do not think that these declarations commend *40 this case to the favorable consideration of the court, because they give his enterprise a stock-jobbing character. He lays no stress upon the failure of the defendants to^ assist in developing his inventions', but only on their failure to give value to the stock by their navies. If these gentlemen had been satisfied as to the value of these patents, then he might reasonably have expected that they would make use of their extensive acquaintance and influence in getting them into use, and we have no reason to doubt that his expectations would have been fairly met, but to expect them to give their names to this enterprise and to issue stock with their names upon it, without being satisfied of the utility of the patents, was more than he had a right to. There was nothing in the conduct of these defendants either before or after the execution of the agreement that would warrant him in those expectations. The fact is, the complainant desires to embody his expectations into the contract. The case can readily be supposed of a gratuitous transfer to individuals of an interest in an invention without any consideration or agreement whatever, the owner relying upon their self-interest as a motive to exert themselves to promote the success of the invention. Now, suppose that after examining the invention, the parties receiving tiñese interests should conclude that it was not worth their while to do anything further to bring the invention before the public, or even suppose that they, either from overcaution or from other cause fail to contribute their capital or labor to the development of such enterprise ; the owner might complain of want of generosity, of want of enterprise, and he might say that they were under some moral obligation to him to. render something for the interest given in the enterprise, but he would have no legal remedy. The defendants in this case gave no money except the trifling sum of $150 each, and they were not bound to give more. They were not bound to issue stock except as they thought proper. Complainant may have expected them to do it. But the *41 fact that they have failed to come up to his expectations does not amount to a breach of contract, and he is not entitled to a forfeiture of the interest that they acquired under this agreement. Even if there had been a breach of the contract, it does not follow that he would be entitled to rescind the entire contract and reclaim all that he had transferred. He has had some partial benefit from it, and they have contributed their labors for a year and more. They have done something, and his remedjq if he has any, would be a common law action for damages for a non-fulfillment of the contract, but he cannot rescind it, and call upon a court of equity to abrogate the contract and restore to him everything received by the defendants under it.
The next question is, is he entitled to an accounting. He asks for an account only upon one or two grounds in his prayer for relief. He first asks that the defendants be required to repay to him all the moneys or certificates of interest they may have received from the corporations. It should be stated that certain sums of money were received from the sale of State rights, which went into the treasury of the Pan-Electric Telephone Company, and that there were two dividends made out of these receipts, one in June and one in July, 1884, and the plaintiff received his share. The first dividend was made upon the motion of the complainant himself, and the 'other upon the motion of Mr. Looney, who was his agent. I believe the complainant was present at those meetings and assented to everything. At these meetings, accounts were stated, a balance struck, dividends made, an account stated, it may be said, and settlement was made between the parties, and it would be impossible for complainant to call upon a court of equity to re-open that settlement without showing some evidence to justify it. This money was paid over to these defendants in the complainant’s presence, or with his concurrence, and with full knowledge of the facts on his part, and it is well settled that a payment made under those circumstances *42 cannot be recovered back, even if there was no right, in the first instance, to the payment. Now, he claims an account of the moneys that have been received by the defendants, and the stock that they have received,’ upon the theory of a breach of the .contract, and that they have forfeited all their rights thereunder; and since we have held that no breach of the contract has been committed and no forfeiture incurred, we think he asks for an account of what lie is not entitled to.
He furthermore asks that the partnership shall be dissolved, which he claims to have been created by this agreement, but as we think that there has been no partnership shown to exist, there is no ground for an account upon the theory of that prayer for relief. There are, however, one. or two matters in the body of the bill which might be ground for an accounting against somebody.
In section 29 he says that large amounts of money were paid by purchasers of interests to the partnership concern aforesaid and that defendants got nearly all this money, and left the complainant, whose patent interests they sold, with a very small proportion of the same. He also says that they sold large interests to certain fictitious persons, etc. In paragraph 33, he says that if the defendants had then, at the time of organizing the two corporations, forfeited all right to complainant’s patents, by having determined among themselves without his knowledge or consent, never to fulfill their obligations set forth in Exhibit B, or if they subsequently forfeited said right, that then, and in that case, all the stock of said corporation which said defendants have acquired belong equitably to the complainant, and that defendants should be required to pay to complainant all the money, stocks or certificates of stock they had drawn from said corporation and pay him besides not less than $100,000. He further says .that the moneys were all paid over to the treasurer of the Telephone Company, agent of the joint stock company, and that said agent paid the *43 greater part of it to defendants, giving complainant less-than was equitably due to him.
Now, if that were true, he, perhaps, would have a right to an accounting; if there is anything to show that more was paid to these defendants than they were entitled to. But suppose that to be so, what would be' the remedy? If he had any remedy against them, it would bq an action for money had and received, to recover the excess of the money paid to them. It does not appear that more than they were entitled to was paid to them, but if it were so, we think the proper remedy would be to file a bill against the Telephone Company — to require a new statement of the account. That company is responsible, if anybody, for the alleged unequal distribution, and it and the other stockholders should be sued together. That company is not a party to this suit, and we think it could not be made a party for that purpose, because it is a corporation created in another .jurisdiction and not accountable to us here in the regulation of its domestic affairs, and therefore there is no remedy against the defendants in this court, even if there were ground for an accounting in respect to this subject.
There is one thing, perhaps, in respect to which the complainant might be entitled to an account. I should further-say, about these dividends, that the money did not come in gross into the hands of the defendants as the original members of the association at all, but it was paid directly from the treasury of the Telephone Company, to each individual as stockholder in that company, so that the defendants, as a part of the original association, never became responsible at all, if there was any unequal distribution, but only the Telephone Company.
When these State rights were sold, the price paid was partly in.cash and partly in local stocks of the companies incorporated in the different States. Now, it does not appear what became of those local stocks that went into the treasury of the Telephone Company and complainant. *44 would be entitled to his share in them, but'his claim would be against the Telephone Company.
In his bill he prays that the partnership may be dissolved. Notv, is there anything to be dissolved ? It is very plain that the corporation could not be dissolved;' in fact, the complainant himself repudiates that idea. It seems to be equally plain that the stocks owned by these parties were not the subject of partnership ownership. It was stipulated in the original agreement that they should be joint owners, but even that joint ownership has been destroyed by the act of the complainant himself, by having the' stock listed off to himself, and the whole matter shows that there is no joint ownership, no interest in the stock that the complainant has, on the part of the defendants, and the complainant has no interest in the stock that the •defendants have — there is no partnership there. Whether there is any partnership in the patents that were not assigned by the corporations might be perhaps a question, but 1 think that becomes unnecessary to decide, for reasons which I will now mention. Our impression is that the complainant is entitled to have re-assigned to him some of these patents. Under the orignal agreement the patents were to be worked by a corporate body. The companies did work some of the patents, but others were abandoned, as not valuable, and we think they ought to be restored to the complainant, not on the ground of any forfeiture or breach of the contract, but on the ground that the parties having elected to incorporate themselves to prosecute these other patents, the’contract has simply fallen through and been abandoned, as to those not assigned to the corporations and upon this ground the patents should be re-assigned to the complainant.
The complainant has failed to establish the body of liis •complaint, and, of course, we hold that he is not entitled to any costs against the defendants. We have looked into the matter of costs, and we find that the taxable costs of the *45 defendants, when divided among' them, amount to but a trifle, and as some relief is afforded to the complainant, we think it is fair that each party pay Iris own costs. The decree, therefore, will be that the patents that were not embraced in the telephone and telegraph companies shall be re-conveyed to the complainant, but, as to the other matters, the bill shall be dismissed without costs to either party.
AVe have one word to say in conclusion, and that is, that the bill contains very serious charges against the-defendants of conspiracy to defraud him, &c., and we deem it proper to say that, in our judgment, not a particle of proof has been adduced to sustain the charges, and we think that there is nothing in the conduct of the defendants that is inconsistent with entire integrity and good faith.